**In the United States District Court
for the Southern District of Florida
Fort Lauderdale Division**

Civil Action No. _____
United States District Judge _____
United States Magistrate Judge _____

FILED BY _____ D.C.

OCT 28 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

---

UNITED STATES OF AMERICA *ex rel*
MARK DOYLE,

    *Plaintiff-Relator*,

v.                              Filed Under Seal

TRINITY HEALTH, AND
HOLY CROSS HOSPITAL, Inc.,        Jury Trial Demanded

    *Defendants.*

---

### False Claims Act Complaint
### Filed Under Seal Pursuant To 31 U.S.C. § 3730(B)(2)

Pursuant to 31 U.S.C. § 3730(b)(1), the United States of America *ex rel.* Mark Doyle ("Relator") files this action against defendants Trinity Health ("Trinity") and Holy Cross Hospital ("Holy Cross") (collectively, "the Defendants") to recover damages and civil penalties for violations of the False Claims Act, 31 U.S.C. § 3729, et seq., ("FCA"), on behalf of himself and the United States of America, its agency the United States Department of Health and Human Services ("DHHS"), and the Centers for Medicare & Medicaid

Services ("CMS") pursuant to 31 U.S.C. § 3730(b)(1). In support thereof Relator alleges the following:

## I.   NATURE OF THE ACTION

1.     This action arises in part from Defendants' deliberate scheme to defraud the federal government and the Medicare healthcare benefit programs and other federal healthcare benefit programs by causing the submission of tens of thousands of false claims resulting in hundreds of millions of dollars of loss to the United States. Relator brings this action to remedy the harm the Defendants have caused the United States by submitting and causing to be submitted through the federal Medicare program and other federal healthcare programs thousands of false claims for services with knowledge of or in reckless disregard of the fact that the Defendants were not entitled to reimbursement because (1) the claims did not meet the requirement for split/shared billing attributable to a physician; (2) the Defendants' compensation arrangements with its employed physicians violated the Federal Anti-Kickback Statute and the Stark Law at the time the claims were submitted; or (3) the claims were for medically unnecessary services.

2.     The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for

2

payment or approval is liable for a civil penalty for each such claim submitted or paid, plus three times the amount of the false claim submitted to the Government. The FCA allows any person who has information regarding a false or fraudulent claim against the Government to bring an action for him or herself and for the Government and to share in any recovery. Relator is such a person.

3. As required by 31 U.S.C. § 3730(b)(2), Relator is providing to the Government a statement of substantially all material evidence and information related to this Complaint currently in Relator's possession. This disclosure statement shows that the Defendants knowingly submitted, or caused to be submitted, false or fraudulent claims to the Medicare program and other federal programs for payment or approval, as well as knowingly made, used, and caused to be made and used, false records or statements material to a false or fraudulent claim as defined in the FCA, all in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (B).

## II. PARTIES

4. Relator Mark Doyle is a United States citizen and a resident of Florida. Since June of 2020, he has been the President and CEO of Holy Cross in Fort Lauderdale, Florida. He has direct personal knowledge of the scheme described in this Complaint based on his access to and review of Holy Cross

records and policies and on his interactions with Holy Cross and Trinity executives, compliance employees, physicians, advanced practice providers, and other staff.

5.     The United States is the real plaintiff in interest with respect to the claims asserted in this matter. The defrauded Medicare program is administered and supervised by CMS, which is a division of DHHS. Defendants' conduct described below also resulted in the submission of false and fraudulent claims for payment and statements in connection therewith submitted to other federally funded and administered health-insurance programs, such as Medicaid and TRICARE.

6.     Trinty is a Michigan nonprofit corporation. It employs nearly 36,500 physicians and clinicians across 27 states. The Trinity system includes 92 hospitals, 126 continuing-care locations, the second largest Program of All-Inclusive Care for the Elderly in the country, 136 urgent care locations, and many other health and well-being services. Its registered agent is CT Corporation System, 40600 Ann Arbor Road, Suite 201, Plymouth Michigan, 48170. It is the sole owner of Holy Cross and manages its operations. It employs several executive personnel including the following: (1) Michael Slubowski, Trinity's CEO; (2) Ben Carter, Trinity's COO; (3) Dan Roth, Trinity's CMO;

4

(4) Robert Casalou, Trinity's Regional CEO of Michigan, Florida, and Georgia; (5) Mark LePage, Trinity's VP of Physician Medical Group; (6) Dawn Geisert, Trinity's Chief Compliance Officer; and (7) Pam Del Negro, Trinity's Regional Compliance Officer. In addition to its ownership of Holy Cross, Trinity provides significant oversight and management services. The compliance and finance functions at Holy Cross are provided by Trinity and the compliance and finance personnel report directly to the Trinity's national System Office, which makes policy and decisions regarding all the hospitals within the Trinity system, including Holy Cross.

7.     Holy Cross is a Florida not-for-profit corporation operating in Ft. Lauderdale, Florida. Its registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324. It also employs several executive personnel, including (1) Daniel Isaacson, its Chief Financial Officer; (2) Michael Gusho, its Regional CFO; and (3) Todd Radosovich, its Vice-President of Finance.

## III.   JURISDICTION AND VENUE

8.     This Court has personal jurisdiction over the Defendants because the Defendants have adequate minimum contacts with the State of Florida because they do business here. Additionally, Defendant Holy Cross, a Florida

5

not-for-profit corporation, is domiciled in this State and it has its principal place of business in this State and this District.

9. This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b), which provide this Court with original jurisdiction to hear a qui tam action. Relator is an "original source" and brings this action in the name of the United States, as the FCA, 31 U.S.C. §§ 3729–33, contemplates.

10. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) because the Defendants transact business there and have committed acts prohibited by 31 U.S.C.§ 3729 there.

11. The information in this Complaint has not previously been disclosed publicly, including in any criminal, civil or administrative hearing, nor in any congressional, administrative or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media. As detailed below, Relator has direct and personal knowledge of such allegations and transactions. To the extent that any such facts thereof become public, Relator voluntarily provided disclosures of these allegations and transactions to the United States pursuant to the FCA's requirements before such public release or knowledge.

## IV. FACTS

### A. The Medicare Program

12. Medicare is a health-insurance program that is funded by taxpayer revenue and administered by the United States government. CMS, which is within DHHS, implements and oversees the Medicare program. Medicare serves as an insurance company in providing coverage for medical care to persons over 65 years of age, persons with a disability, and other persons who qualify for the program.

13. Medicare Part A covers services considered medically necessary, such as inpatient hospital care, critical-access care, short-term care in skilled nursing facilities, hospice, and home-health care primarily for persons over age 65 and those who qualify for Social Security Disability insurance. Part A's benefits are paid from the federal Hospital Insurance Trust Fund, which is financed mainly through payroll taxes on earnings and income taxes on Social Security benefits.

14. Medicare Part B is a voluntary subsidized insurance program covering, among other things, physicians' services and certain outpatient hospital care. *See* 42 C.F.R. § 424.24. Part B's benefits are paid from the federal

Supplemental Medical Insurance Trust Fund, which is financed by individual premiums and general federal-tax revenues.

15. To bill Medicare Part A or Part B for patient services, an individual health care provider or institutional entity must first apply for a National Provider Identifier ("NPI"), which is a unique ten-digit number.

16. Some types of healthcare providers who are not physicians but who practice in collaboration with or under the supervision of physicians may apply for their own NPIs. These non-physician practitioners ("NPPs")—also referred to as mid-level practitioners, physician extenders, and advanced practice providers ("APPs")—include nurse practitioners, physician assistants, certified nurse specialists, and certified nurse midwifes.

17. Each Medicare enrollment application requires the applicant to agree to "abide by the [applicable] Medicare laws, regulations, and program instructions," to agree that any "overpayment made to the provider by the Medicare program may be recouped by Medicare," and agree the applicant "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" or "submit claims with deliberate ignorance or reckless disregard of their truth or falsity." *See, e.g,* Forms CMS-855A, CMS-855B.

18.     Upon receiving an NPI, the provider or entity must then enter into a provider agreement with CMS, agreeing to conform to the provisions of section 1866 of the Social Security Act and applicable provisions in 42 CFR. A provider or entity that fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

19.     To administer Medicare, CMS uses Medicare Administrative Contractors ("MACs"). A MAC is a private health care insurer that has been awarded a geographic jurisdiction to process Medicare Part A and Part B medical claims. CMS relies on a network of MACs to serve as the primary operational contact between the Medicare Fee-for-Service program and the health care providers enrolled in the program. MACs are multi-state, regional contractors responsible for administering both Medicare Part A and Medicare Part B claims. In the state of Florida, the CMS MAC is First Coast Service Options.

20.     When submitting a claim to a MAC for Medicare reimbursement, a provider or entity must certify that the "information on [the claim] form is true, accurate and complete," that the claim "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment," and that "the services [claimed] on th[e] form were medically

9

necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision." *See* Form 1500.

21. As a condition of payment by Medicare, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as a hospital "cost report." A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries. As discussed above and below, each cost report contains mandatory certifications of compliance with the Anti-Kickback Statute and the Stark Law.

22. After the end of each hospital's fiscal year, a hospital must file its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395(g); 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

23. Medicare payments for inpatient hospital services are determined by the claims the provider submits for particular patient discharges (specifically listed on UB-92 Forms or UB-04 Forms after March of 2007) during the course

10

of the fiscal year. On the cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider are subtracted to determine the amount due Medicare or the amount due the provider.

24. Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

25. For each of the Fiscal Years between 2020 and the present, each cost report certification page submitted by Holy Cross included the following notice: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."

26. On each cost report for each Fiscal Year from 2020 through the present, the responsible officer of Holy Cross was required to certify, in pertinent

11

part, as follows: "I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report ... and that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

27.   Holy Cross was required to certify that its filed cost reports were (1) truthful, in that the cost information contained in the report was true and accurate; (2) correct, in that the provider was entitled to reimbursement for the reported costs in accordance with applicable instructions; and (3) complete, in that the cost report was based upon all knowledge known to the provider. Holy Cross also was required to certify that the services provided in the cost report were not linked to kickbacks and that the provider had complied with all laws and regulations regarding the provision of health care services, such as the Anti-Kickback Statute and the Stark Law.

28.   Holy Cross was also required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports)

to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) provides "Whoever ... having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment ... conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized ... shall in the case of such a ... concealment or failure... be guilty of a felony."

29. For fiscal years 2020 through 2024, Holy Cross submitted annual cost reports to CMS and attested to the certifications stated above.

30. After the submission of their cost reports each year to CMS, Holy Cross had ongoing duties and opportunities to request the reopening of their previous cost reports to correct false information submitted to Federal healthcare programs.

31. In addition to the inpatient fees billed by hospitals, physicians also separately bill for their services provided to Medicare patients under Part B. Physicians and physician groups submit Form CMS-1500 for this purpose.

32. Form CMS-1500 requires the physician to certify that he or she "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or

13

concealment of a material fact, may be prosecuted under applicable Federal or State laws."

33.     By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the Medicare Program, and that they have complied with all applicable regulations and laws governing the Program, such as the Anti-Kickback Statute and the Stark Law.

**B.     Split/Shared Billing**

34.     Each year, CMS issues a Medicare Physician Fee Schedule ("MPFS") final rule that updates the standards for physician reimbursement and policies related to the delivery of health care. The MPFS includes a comprehensive list of maximum fees used by Medicare to reimburse physicians and other health care providers and suppliers.

35.     Between 2006 and 2018, CMS reimbursed providers 100 percent of the MPFS amount when NPPs and physicians who worked for the same employer or entity both participated in an evaluation and management ("E/M") patient visit on the same day in an inpatient or outpatient hospital setting, so long as the physician had provided any face-to-face portion of the E/M patient encounter. *See* CMS Pub. 100-04. CMS refers to patient encounters of this type as "split/shared visits."

14

36. If a split/shared visit was billed under the physician's NPI, CMS reimbursed the provider 100 percent of the MPFS amount for the billed service. If a split/shared visit was billed under the NPP's NPI, CMS reimbursed the provider 85 percent of the Medicare Physician Fees Schedule amount for the billed service.

37. Effective January 1, 2018, CMS finalized changes to the split/shared visit regulations and MPFS, specifying that a split/shared visit should be billed under the name and NPI of the physician or non-physician practitioner who had performed the "substantive portion" of the visit. This rule clarified that "substantive portion" was generally considered to be the part of the visit during which the majority of the work had been performed.

38. Between January 1, 2019, and December 31, 2021, the MPFS and regulations appliable to split/shared visits continued to reiterate and reinforce the policy that bills for such visits should be submitted under the NPI of the provider who had performed the majority of the work during the visit.

39. Effective January 1, 2022, CMS implemented a new rule for split/shared E/M visits. *See* 86 Fed. Reg. 64,996 (Nov. 19, 2021), https://www.govinfo.gov/content/pkg/FR-2021-11-19/pdf/2021-23972.pdf. The new rule provided that a split/shared E/M visit could be billed only under

15

the NPI of the provider who had either (1) performed more than half of the total time of the patient visit, or (2) fully performed the patient history, exam, or medical decision-making ("MDM"). *See id. at* Table 26.

40.    Under the 2022 rule, documentation in the medical record had to identify the physician and NPP who had participated in the patient visit, and the provider who had performed the substantive portion of the visit (and was therefore the rendering provider for the visit for billing purposes) had to sign and date the medical record, attesting that he or she had personally performed either more than half of the total time of the patient visit or the patient history, exam, or had performed medical decision-making.

41.    That rule remained in effect until January 1, 2024, when CMS adopted the Current Procedural Terminology ("CPT") guideline for reporting a split/shared E/M visit. That guideline provides:

> If the physician or other [Qualified Heath Care Provider] performs a substantive portion of the encounter, the physician or other QHP may report the service. If code selection is based on total time on the date of the encounter, the service is reported by the professional who spent the majority of the face-to-face or non-face-to-face time performing the service. For the purpose of reporting E/M services within the context of team-based care, performance of a substantive part of the MDM requires that the physician(s) or other QHP(s) made or approved the management plan for the number and complexity of problems addressed at the encounter and takes responsibility for that plan with its inherent risk of complications and/or morbidity or mortality of patient management. By doing so, a physician or other QHP has performed two of the three

16

elements used in the selection of the code level based on MDM. If the amount and/or complexity of data to be reviewed and analyzed is used by the physician or other QHP to determine the reported code level, assessing an independent historian's narrative and the ordering or review of tests or documents do not have to be personally performed by the physician or other QHP because the relevant items would be considered in formulating the management plan. Independent interpretation of tests and discussion of management plan or test interpretation must be personally performed by the physician or other QHP if these are used to determine the reported code level by the physician or other QHP.

42. Under this guideline, a provider may not bill under a physician's NPI for a split/shared visit unless the physician spent more than half of the time with the patient *or* performed a "substantive part of the medical decision-making."

43. When using medical decision-making as the basis for billing a patient encounter, the physician or NPP must have made or approved the management plan for the number and complexity of problems addressed at the encounter and must take responsibility for that plan with its inherent risk of complications and/or the morbidity or mortality of patient management. *See* 88 Fed. Reg. 78818, 78982–78985.

44. For any split/share visit billed to CMS based on the physician or other qualified health care provider's MDM, the medical record must contain sufficient documentation to show which provider performed the MDM portion of the visit.

17

45. If a provider elects to bill CMS using the time-based option, the provider must track and document in the medical record the time each provider spent with the patient. Only one provider can take credit for the minutes with a patient when both providers are in the room.

46. Regardless of whether a split/shared visit is billed based on MDM or on time, the provider who bills the split/shared visit must sign and date the medical record. A physician's signature on its own, however, is not sufficient to support billing at the physician's rate for the split/shared visit. Documentation in the medical record must identify the physician and the NPP who actually performed the visit and exercised MDM.

## C. The FCA

47. The FCA, as set out in 31 U.S.C. § 3729(a)(1), prohibits knowingly presenting, causing to be presented, or conspiring to present to the United States any false or fraudulent claim for payment. Further, as set out in 31 U.S.C. § 3729(a)(2), the FCA prohibits knowingly presenting, causing to be presented, or conspiring to make or use a false record or statement to obtain payment or approval for a false or fraudulent claim. A provider violates the FCA when the provider submits claims to CMS that either expressly or impliedly certify

18

compliance with Medicare laws and regulations while knowingly failing to disclose violations of any Medicare rules and regulations.

48. Each violation of the FCA is a violation of federal law that is punishable by three times the amount of the actual damages sustained by the government, as well as a civil penalty of between $13,946 and $27,894 per claim for violations that occurred after November 1, 2015, and that are assessed after February 12, 2024.

49. Under the FCA, the term "knowingly" means that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. The FCA does not require proof of a specific intent to defraud.

50. The Defendants' actions, described below, constitute both the submission of false and fraudulent claims in violation of the FCA and the creation, or causing the creation, of false medical records to support the payment of those claims. The Defendants' actions have directly caused the submission of tens of thousands of false claims to Medicare and other government programs dating back to at least 2020. The false claims were for purportedly split/share E/M services that were billed under a physician's NPI but were actually

19

attributable to NPPs under the Medicare rules and regulations. Defendants further violated the FCA by submitting claims in conjunction with false certifications of compliance with the Anti-Kickback Statute and the Stark Law.

**D.    The Federal Anti-Kickback Statute**

51.    Federal law prohibits the payment of kickbacks in exchange for referring a person for medical services. The Medicare and Medicaid Fraud and Abuse Statute, referred to herein as the "Anti-Kickback Statute," 42 U.S.C. §1320a-7b(b), was enacted under the Social Security Act in 1977. It arose out of Congressional concern that payoffs to those who influence healthcare decisions will result in the provision of goods and services that are medically inappropriate, unnecessary, of poor quality, or even harmful to patients.

52.    The Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti- kickback" provisions to be enforced under the FCA. It provides that all claims for payment for services tainted by kickbacks are false claims under the FCA. *See* 42 U.S.C. § 1320a-7b(g).

53.    The Anti-Kickback Statute prohibits any person or entity from making or accepting any remuneration to induce or reward any person for

20

ordering or arranging for or recommending any service for which payment may be made under a federally-funded health care program. 42 U.S.C. §1320a-7b(b). It ascribes liability to both sides of an impermissible kickback relationship.

54. To protect the integrity of federal health care programs from these difficult-to-detect harms, the Anti-Kickback Statute prohibits the payment of kickbacks in any form, regardless of whether the particular kickback actually lead to overutilization or poor quality of care. Thus, proof of taint is sufficient, without the need to prove the effect and damages caused by the taint on specific decisions.

55. Certification of compliance with the Anti-Kickback Statute is a condition of payment for claims submitted by entities such as Holy Cross. Payment practices under all Federal Government healthcare programs closely align with the rules and regulations governing Medicare payments. Medicare and all other Federal Government healthcare programs require every service provider who seeks payment from the program to promise and ensure compliance with the provisions of the Anti-Kickback Statute and with other federal laws governing the provision of healthcare services in the United States. Certification of compliance with the Anti-Kickback Statute is a precondition to participation as a healthcare provider under the Medicare program.

21

56.    The Office of the Inspector General of HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the Anti-Kickback Statute because such practices are unlikely to result in fraud or abuse. *See* 42 C.F.R. § 1001.952. Only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded safe-harbor protection.

57.    One of those safe harbor provisions exempts from the Anti-Kickback Statute personal-services and management contract and outcomes-based arrangements so long as all of the following standards are met:

(i)      The agency agreement is set out in writing and signed by the parties.

(ii)     The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(iii)    The term of the agreement is not less than 1 year.

(iv)    The methodology for determining the compensation paid to the agent over the term of the agreement is set in advance, **is consistent with fair market value in arm's-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs.**

(v)     The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

(vi)    The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R.§ 1001.952(d)(1) (emphasis added).

58.    Since at least 2021, the Defendants' physician-compensation arrangements have violated the Anti-Kickback Statute because, as described below, physicians have been routinely compensated for services they did not provide in exchange for referrals to Trinty hospitals and clinics, including Holy Cross. Yet, as discussed below, Holy Cross routinely falsely certifies to Medicare that it complies with the Anti-Kickback Statute and other federal laws and regulations and creates false records to support those false claims.

**E.    The Stark Law**

59.    A section of the Social Security Act, 42 U.S.C. § 1395nn—commonly known as the "Stark Law"—prohibits a hospital (or other entity providing healthcare items or services) from submitting claims to Medicare (*see* 42 U.S.C. § 1396b(s)) for payment based on patient referrals from physicians who have an improper "financial relationship" (as defined in the statute) with the hospital. In enacting the Stark Law, Congress found that improper financial

relationships between physicians and entities to which they refer patients can compromise the physician's judgment regarding whether an item or service is medically necessary, safe, effective, and of good quality. The law was designed specifically to reduce the loss suffered by the Medicare Program due to utilization of services motivated by financial considerations.

60.    As of January 1, 1995, amendments to the Stark Law apply to patient referrals by physicians who have a prohibited financial relationship for certain "designated health services," including, among other things inpatient and outpatient hospital services. *See* 42 U.S.C. § 1395nn(h)(6).

61.    42 U.S.C. § 1395nn(a)(1) provides:

Except as provided in subsection (b), if a physician … has a financial relationship with an entity specified in paragraph (2), then—

(A)    the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)    the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

24

62. 42 U.S.C. § 1395nn(a)(2)(B) provides that a "financial relationship" between a physician and an entity includes a "compensation arrangement," as defined in 42 U.S.C. § 1395nn(h)(1).

63. 42 U.S.C. § 1395nn(h)(1) defines "compensation agreement" as "any arrangement involving any remuneration between a physician … and an entity other than an arrangement involving only remuneration described in subparagraph (C)." (Subparagraph (C) is not applicable here).

64. 42 U.S.C. § 1395nn(e) sets out the types of financial arrangements that do not violate the Stark Law. It provides, in pertinent part, "[t]he following shall not be considered to be a compensation agreement described under subsection (a)(2)(B)":

(2) Bona fide employment relationships

Any amount paid by an employer to a physician (or an immediate family member of such physician) who has a bona fide employment relationship with the employer for the provision of services if—

(A) the employment is for identifiable services,

(B) the amount of the remuneration under the employment—

(i) is consistent with the fair market value of the services, and

(ii) is not determined in a manner that takes into account (directly or indirectly) the volume or

25

value of any referrals by the referring physician,

(C)    the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and

(D)    the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

65.    Thus, compensation paid under a bona fide employment relationship may be proper under the Stark Law, but only if: (1) the compensation arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement; (2) the arrangement covers all services to be provided by the physician to the entity; (3) the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the entity of the arrangement; (4) the compensation to be paid over the term of the arrangement is set in advance, does not exceed the fair market value for the services, is not determined in a manner that considers the volume or value of any referrals or other business generated between the parties (unless the agreement falls within the narrowly defined physician-incentive plan), and (5) the services do not involve promoting any activity that violates state or Federal law.

26

66.    42 U.S.C. § 13955nn(g)(1) provides, "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1)."

67.    Furthermore, if a person or entity collects payments billed in violation of 42 U.S.C. § 1395nn(a)(l), that person must refund those payments on a "timely basis," defined by regulation not to exceed 60 days. *See* 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 41 1.353(d); 42 C.F.R. § 1003.101.

68.    Violations of the Stark Law may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of up to $15,000 for each service in a claim for which the entity knew or should have known that the payment should not be made; and (b) an assessment of three times the amount claimed for a service rendered under a referral the entity knows or should have known was prohibited. *See* 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

69.    Since at least 2022, the Defendants' physician-compensation arrangements have violated the Stark Law because physicians have been routinely compensated for services they did not provide in exchange for referrals to Trinty hospitals and clinics, including Holy Cross. And Holy Cross routinely

27

falsely certifies to Medicare that it complies with the Stark Law and other federal laws and regulations and creates false records to support those false claims.

## F.    The Defendants' Scheme to Defraud

### i.    *The split/shared billing fraud*

70.    In determining the amount to reimburse health care providers for services rendered, CMS uses the American Medical Association's resource-based relative value scale ("RBRVS"). The RBRVS is based on the principle that payments for provider services should vary with the resource costs for providing those services. It is intended to improve and stabilize the payment system while providing providers with an avenue to continuously improve the system.

71.    Relative Value Units ("RVUs") are the basic components of the RBRVS. RVUs define the value of a service or procedure relative to all services and procedures. This measure of value is based on the extent of physician work, clinical and nonclinical resources, and expertise required to deliver the healthcare service to patients.

72.    RVUs are the foundation of the MPFS, as well as the basis of most commercial fee schedules. To accurately capture the consumption of time, effort, and money involved in providing a service to patients, the RBRVS model uses three types of RVUs, that, when totaled, determine payment:

- Work RVUs ("wRVUs") account for the provider's work when performing a procedure or service. Variables factored into this value include technical skills, physical effort, mental effort and judgement, stress related to patient risk, and the amount of time required to perform the service or procedure.

- Practice expense RVUs reflect the cost of clinical and nonclinical labor and expenses of the practice. These include medical supplies, office supplies, clinical and administrative staff, and pro rata costs of building space, utilities, medical equipment, and office equipment.

- Malpractice RVUs reflect the cost of professional liability insurance based on an estimate of the relative risk associated with each CPT code.

73. Holy Cross employs approximately 131 physicians, who are compensated in part based on their wRVU productivity. About 70 of those physicians work with NPPs and engage in split/shared patient services.

74. To keep track of the wRVUs attributable to its physicians, to maintain patients' electronic medical records ("EMRs"), and to perform data-management and analytical functions, Trinity has used the EPIC software system since 2022.

75. Upon assuming his responsibilities at Holy Cross, Relator was surprised to learn how Trinity manages its hospitals. Although he was hired as Holy Cross CEO, the Compliance Department, Legal Department, and Medical Director reported to Trinity Executives, rather than to him.

29

76. Of particular concern to Relator was the compliance function. Relator had previously worked as CFO in five different healthcare systems, including Kindred Health, Universal Health Services, Tenet Healthcare, Broward Health in Fort Lauderdale, and Ascension Health. In 2014, he had been appointed CEO of Memorial Hospital Pembroke, owned by Memorial Healthcare System based in Hollywood, Florida. All of the hospital systems for which he had previously worked as CFO or CEO had robust compliance departments. At Holy Cross in Florida, however, only one person worked in the Compliance Department, and she reported directly to Trinity's Systems Office in Michigan.

77. Trinity remotely manages compliance at all of its 92 hospitals, including Holy Cross. Dawn Geisert, the head of the Compliance Department worked out of her home in Michigan. Neither Ms. Geisert nor any of her Michigan-based direct reports ever visited HCH. There was no training function to educate the physicians and APPs on changes to Medicare billing practices. There were no audits scheduled, and the medical staff was untethered from any oversight by HCH's compliance function. This directly contributed, or caused, the fraudulent billing practices detailed below. Relator knows that this remote system of compliance was common to all of the hospitals operated by Trinity,

30

which includes 92 different hospital facilities. Relator, through his investigation and communication with Trinity's compliance function, came to learn that many of the concerns detailed in this Complaint were present at other hospitals operated by Trinity. On information and belief, similar or identical schemes to submit false claims are being perpetrated at other hospitals overseen and operated by Trinity.

78.     In September of 2022, Relator noticed that Holy Cross's employed physicians were being paid far more than most employed physicians in other hospitals. Upon reviewing the earnings of the hospital-employed physicians, he discovered that more than 70 percent of Holy Cross's specialist physicians were being compensated above the 90th percentile of the national standards. Typically, the compensation of fewer than 5 percent of hospital-employed physicians in an employed model exceed that 90th percentile.

79.     Relator also discovered that, although Holy Cross compensated physicians $150 per hour for supervising medical residents, Holy Cross was also giving those physicians wRVU credit for the patient services performed by medical residents, resulting in Holy Cross compensating the physicians twice for performing the same services.

80.    Suspecting that the physicians were abusing the wRVU-based compensation system by taking credit for wRVUs relating to services they had not performed, Relator then reviewed data maintained in the EPIC system relating to split/shared patient services. He discovered a plethora of instances in which an NPP had been reported as the "service provider" for a patient encounter—that is, as the provider who had performed the patient visit and had exercised the medical decision-making—yet a physician had been reported as the "billing provider."

81.    Because Medicare rules only permit a healthcare provider to bill for split/shared patient visits based on the exercise of MDM or on the time spent with the patient, and because Holy Cross appeared to be billing Medicare under the physician's NPI the vast majority of the time regardless of whether Holy Cross's records showed that an NPP had actually performed the service or exercised the MDM, Relator promptly notified the Chief Compliance Officer, Dawn Geisert, of his findings and concerns by email in January of 2023. Based on a review of the records and claims data, more than 80 percent of the claims that Holy Cross submitted as split/shared visits should have been billed solely under the NPP who had actually performed the service and exercised MDM.

82.    Geisert and Holy Cross's Compliance Department then reviewed a sample of claims and determined that the manner in which Holy Cross had been billing Medicare for split/shared patient services raised significant compliance issues.

83.    By late June 2023, Holy Cross's Manager of Compliance, Donnell Santa-Cruz, had confirmed that some of the documentation for the billing of split/shared visits in Holy Cross's ICU did not support billing under a physician's NPI, as had already been submitted to Medicare and other payers.

84.    In August 2023, Santa-Cruz prepared a chart showing dozens of examples of instances in June and July of 2023 when Holy Cross had billed Medicare under a physician's NPI for a split/shared patient visit without underlying documentation supporting that billing or with underlying documentation actually refuting the physician attestation that he or she had met the criteria to bill for the service.

85.    The chart showed, for example, that patient R.M. had been seen by NPP Rejoy Mahtai on June 24, 2023, for an E/M visit but Holy Cross had falsely billed Medicare under the NPI of physician Felipe Albuquerque. The chart showed that Dr. Albuquerque had documented neither the time he had spent with the patient nor any component of MDM that he supposedly had

33

completed. Yet Dr. Albuquerque had signed an attestation two weeks after the patient's visit claiming that he had been "physically present for the Evaluation and Management service provided," "agree[d] with the Nurse Practitioner's/Physician assistant's note and plan," confirmed the findings of the physical exam, and had been "physically present for the key portions of the history physical and service provided." These attestations were not supported by any documentation in R.M.'s medical record.

86. The chart showed further, for example, that patient B.B. had been seen by NPP Lana Simmonds for an E/M visit on June 28, 2023, yet Holy Cross had billed Medicare under the NPI of Holy Cross physician Joshua Perow. Because the patient's record contained no documentation from any physician, Holy Cross's Medicare claim was false.

87. The chart showed further, for example, that patient K.S had been seen by NPP Melissa Devincentis for an E/M on July 12, 2023, but Holy Cross had falsely billed Medicare under the NPI of physician Daniel Weiz. The chart showed that Dr. Weiz had documented neither the time Dr. Weiz had spent with the patient nor any component of MDM that he supposedly had completed. Yet Dr. Weiz had signed an attestation two weeks after the patient's visit claiming that he had been "physically present for the Evaluation and

34

Management service provided," "agree[d] with the Nurse Practitioner's/Physician assistant's note and plan," confirmed the findings of the physical exam, and had been "physically present for the key portions of the history physical and service provided." These attestations were contradicted by the documentation in K.S.'s medical record.

88. In addition to E/M visits that were falsely attributed to Holy Cross physicians, the chart showed many examples of services that Holy Cross had falsely billed to Medicare under the NPI of a Holy Cross physician with the underlying documentation falsely claiming that an NPP had served merely as the "scribe" for the visit. It showed, for example, that Holy Cross had billed Medicare under the NPI of Cardiologist Rishi Anand for services provided to patients L.G., A.A., and M.R. on June 30, July 6, and July 7, 2023, with the patients' progress notes stating that a nurse practitioner had served merely as the scribe for those visits. However, in those examples the nurse practitioner in truth had been the sole rendering provider and Dr. Anand had not provided any services to the patients during those encounters.

89. The Compliance Department shared that chart with Relator and numerous Holy Cross physicians and executives. Together, the Finance and Compliance Departments then reviewed additional data maintained in EPIC

35

and determined that, in the intensivist department and the pulmonology department, 100 percent of the wRVUs were being billed under a physician's NPI and none were being billed under an NPP's NPI in both inpatient and outpatient settings. Yet, 70 percent of the wRVUs generated by both the intensivist department and the pulmonology department resulted from services solely provided by an NPP, rather than by the physician under whose NPI the service had been billed. In other words, Holy Cross's own Compliance Department determined that Holy Cross was billing Medicare and other payors for services provided by NPPs as if physicians had performed those services, and physicians were being given wRVU credit for those services, which increased their compensation based on work they had not performed.

90.    On September 26, 2023, Santa-Cruz emailed Relator and told him that he had "received the data for urology and reviewed a couple of office and hospital visits." Santa-Cruz said that that information showed that, in the Urology Department, a PA was seeing the patients in follow-up visits, and those visits were being billed under a physician's NPI despite there being no documentation to support that billing.

91.    Throughout the summer and early fall of 2023, Relator repeatedly pressed the Holy Cross Compliance Department to determine how these and

36

other physicians were able to take credit for all of the work that the NPPs were performing and why they were being compensated for work they had not performed.

92. EPIC records show, for example, that patient G.T. was seen and by nurse practitioner Lauren Ross on August 29, 2023; that Ross assessed the patient and created the medical plan; that Ross created and signed the progress note; but that physician Joshua Michael Larned electronically signed the note and received wRVU credit for Ross's work. Holy Cross Holy Cross submitted to Medicare claim number 13000503664500 under Dr. Larned's NPI seeking payment for the services provided to G.T. based on 100 percent of the MPFS for those services, despite that Holy Cross was entitled to only 85 percent of the MPFS amount because an NPP, rather than a physician, had provided the billed services.

93. On September 5, 2023, Trinity Health Integrity and Audit Services, which is Trinity's compliance function for hospitals within its system, issued a report showing the results of a benchmark and data monitoring review of professional-fee services reported by employed healthcare providers working within the Trinity Health provider network. By using Medicare billing data to determine how each provider compared to other provides in terms of wRVUs,

37

the report identified the particularly "productive providers"—that is, 24 physicians who met or exceeded the 90th percentile benchmark for wRVUs by specialty and two who met or exceeded the 95th percentile. Because so many physicians at Holy Cross were being credited with such high volumes of wRVUs, the report recommended, among other actions, an evaluation of physician/NPP clinical workflow activities and medical documentation.

94. Despite all of these findings confirming that Holy Cross wRVU-based compensation system, policies, and record-keeping failures had resulted in—and was continuing to result in—constant fraudulent billing to Medicare and other insurers, and despite Relator's persistent requests for Trinity and Holy Cross executives and compliance officers to devise a means to correct the problem, the fraud continued.

95. By mid September of 2023, Relator was growing increasingly frustrated with Holy Cross's failure to develop any plan to address the fraudulent billing and improper attributions of wRVUs to physicians who had not earned them. Because Holy Cross had no way to monitor when physicians were falsifying records to ensure they would get wRVU credit for work performed by NPPs, Relator strongly recommended to Trinity Executives that Holy Cross eliminate all split/shared billing in both the inpatient and outpatients settings or,

38

at the very least, increase coding/compliance review of those claims, and he repeatedly asked Trinity's Compliance Department for reports and timelines for updates. These executives included (1) Michael Slubowski, Trinity's CEO; (2) Ben Carter, Trinity's COO; (3) Dan Roth, Trinity's CMO; (4) Robert Casalou, Trinity's Regional CEO of Michigan, Florida, and Georgia; (5) Mark LePage, Trinity's VP of Physician Medical Group; (6) Dawn Geisert, Trinity's Chief Compliance Officer; and (7) Pam Del Negro, Trinity's Regional Compliance Officer.

96.   On October 10, 2023, Relator emailed Santa-Cruz and asked him for an update on the review of split/shared billing data for the cardiology department. Santa-Cruz responded to Relator the next day and told him that that the Holy Cross Compliance Department had found that cardiologists participating in split/shared office and hospital visits were "not documenting a component of the E&M in its entirety," "there were several notes w[h]ere the total time spent was not documented," physicians were using NPPs as scribes although they were "also using the appropriate resources [as] scribes," and there "appear[ed] to be key components such as review of system and the physician exam being documents prior to the patient's visit."

97. Finally, in October 2023, the same executives listed above in Paragraph 95 decided at Relator's behest to completely discontinue split/shared billing in the outpatient setting effective January 1, 2024, to prevent physicians from continuing to take credit for work that NPPs were personally performing. NPPs in the outpatient setting would have their own scheduling templates, with patients being scheduled with, and seen by, NPPs, who would then code and bill for their services. In that situation, the NPP was to receive credit for the wRVUs associated with the service.

98. Holy Cross would, however, continue split-shared billing in the inpatient hospital setting but wRVU credit would go to the provider who had done the medical decision-making. Physicians would still be required to countersign patient progress notes as part of their oversight duties. In addition, physicians and NPPs would be educated "that split-shared billing requires the physician to attest … that they either performed the majority of the service for the patient or that they did the medical decision making for the patient's care."

99. But a physician attestation by itself is not sufficient to support split/shared billing under a physician's NPI. Documentation in the patient record must support any such attestation. Consequently, Relator took the

position that split/shared billing in the inpatient setting could be continued only "with rigorous compliance oversight" and "guardrails around the process."

100.   On information and belief, Trinity was reluctant to implement the necessary policies and procedures to ensure that its split/share billing was compliant because it was fearful of retaliation from its employed physicians, who obtained significant financial benefit from receiving wRVUs that were rightfully attributable to an NPP. To make up for at least some of the compensation that physicians would be losing from their inability to bill for services they had not performed, the new policy called for physicians to be paid a flat fee for supervising NPPs and an hourly fee for supervising medical residents.

101.   On October 18, 2023, Relator met with the Holy Cross Physicians' Advisory Committee to discuss the planned policy changes. Afterward, Relator told Trinity Senior Vice President of Medical Groups and Ambulatory Strategy Mark LePage by email that he had "heard whispers that many of the employed Medical Group docs [were] questioning the changes and [would] be calling the SO for clarification and/or appeal." LePage responded by email, saying that he had already received a call from a "revenue-cycle person" who had been contacted by physicians. LePage warned Relator that Trinity did not want to

41

convey the message that it would no longer allow split/shared billing. LePage told Relator, "We absolutely should 'bill' split shares, where it is allowed, because that allows us to capture physician reimbursement level from the payer as opposed to 85% of that number from [NPPs]." He said that Trinity's "bottom line messaging is that this isn't disallowing split-shared billing, but rather just refining who gets the wRVU credit when something is billed in a split-shared fashion."

102. In follow-up emails to Relator and others, LePage explained further:

> I think we should have a different RVU attribution approach in the inpatient setting. Because in that setting even if the APP does some of the preliminary work on a new consult, by the nature of the acuity of the patient (in general), the physician needs to provide the key decision making in terms of therapeutic approach. So in that setting I'm in favor of the billing provider (ie physician) getting the RVU credit.

> What I'm not in favor of is in a clinic setting (even in a provider-based clinic setting), APP sees 15 patients a day, is lightly supervised by the physician, and the physician takes the RVU credit for those 15 patients.

103. In November 2023, Relator asked the Holy Cross Compliance Department to "review the APPs for Hem Onc and determine if split share is being met," noting, "None of the APPs in Hem Onc are showing any RVUs, so it looks like the doctors are grabbing everything." After reviewing the documentation contained in EPIC, Santa-Cruz responded:

42

> I focused the review on hospital inpatient accounts that were billed by doctors Velez, Drew, Azzi, Aranout and Nagovski. Overall, most of the notes reviewed showed that the APP would see the patients first and would complete the [v]arious components of the consult or progress note. The physicians then would add a statement along the lines that they have reviewed and agree with the contents, **but the documentation did not support that the physicians had completed one component has [*sic*] required by the split shared criteria.**" (Emphasis added.)

In other words, Santa-Cruz confirmed that Holy Cross's documentation for its split/shared billing in the Hematology/Oncology Department did not support the billing it had done under the physicians' NPIs.

104.    Training regarding the implementation of the new policy for billing split/shared E/M visits also began around December of 2023. But, because the elimination of split/shared billing and the attendant compensation-policy change would substantially decrease physician compensation under Holy Cross's wRVU-based  compensation system, many Holy Cross physicians angrily protested the change. Many blamed Relator for the disruption and called for his resignation.

105.    Meanwhile, Relator continued to prod the Holy Cross Compliance Department to address the ongoing non-compliance relating to split/shared billing. On January 31, 2024, he emailed Santa-Cruz, Deborah Baker, and Pamela Del Negro in the Holy Cross Compliance Department, asking: "Do we have a process or reporting mechanism in place to ensure split share compliance?

43

I am not sure if we have closed the loop to prevent the same issues from recurring. Could you let me know what you think we should do?"

106.   On February 7, 2024, Relator emailed Ane McNeil, Trinity's Chief Human Resources Officer, and told her that he "wanted to start forming a remediation plan" for the specialties that had identified billing problems.

107.   McNeil responded the next day and told Relator that the Trinity Compliance Department had identified **at least nine specialty departments that were the subject of compliance concerns relating to the split/shared billing— oncology, radiation oncology, Electrophysiology, cardiology, infectious diseases, orthopedics, pulmonary, ICU, and colorectal surgery.** McNeil told Relator that, as for next steps, a meeting would be scheduled for Relator and the physicians. McNeil assured Relator that she was "not challenging the business … decision with the contracts or split shared billing in the outpatient setting," but wanted to attempt to manage the allegations of retaliation, harassment, and other actions that Relator had reported. At that time, several physicians employed by Holy Cross had contacted the human resources, compliance, and management departments to complain about the changes to the physician-compensation model that Relator was attempting to implement. Relator believed, and had expressed to McNeil, that the physicians were conspiring to

44

have him removed from his position in an effort to prevent the compliance efforts he was spearheading, as it would reduce the income they were receiving from Holy Cross.

108. On February 9, 2024, Trinity Regional CEO Robert Casalou emailed Relator and told him that he thought the best way to address the "gathering storm of doctors who are unhappy" and who were blaming Relator and his team for the policy changes would be for Casalou to attend planned physician meetings along with Relator so that the physicians would have both of them there and the doctors would "feel like Trinity is in the room."

109. Relator responded, saying that he thought it was a great idea for Casalou to be on-site during the physician meetings. But Relator also expressed his concern about Trinity and Holy Cross's slow response to the compliance issues he had raised (which the Compliance Department had confirmed) and to the retaliation he had been experiencing, saying:

> I have to say that this whole production and onslaught of calls by our physicians is very unsettling and unjust. We (myself and our Admin Team) first brought concerns of fraudulent billing practices to [Trinity] Compliance's attention back in May 2023. I have numerous e-mails requesting audits, findings, and recommendations/guidance to correct these deficiencies. Although Compliance indicated that potential fraudulent claims and behavior were occurring, they never responded back to numerous requests for intervention, guidance, corrective measures, and education for our physicians. We only received information that there was

45

inappropriate billing and that it needed to stop. In September, 2023, we introduced the changes to [N]PP scheduling and attribution around the RVUs associated with these encounters to HCH employed physicians. We cited compliance concerns and the necessity to use of APPs to the "top of license" as the primary drivers. It never was nor has it been financially driven. At this point, I do find that myself and the Team is being retaliated against by our HCH physicians because we reported their fraudulent billing practices to Compliance. I think it is the text book definition of retaliation. As I said in the MLC meeting, our reporting of these fraudulent billing practices was the right thing to do and we stand by this decision. But in fairness, these changes should have been led by Compliance, not HCH. HCH leadership and myself have been left holding the bag.

110. Ultimately, Casalou met with a group of Holy Cross physicians without including Relator. During that meeting, Casalou assured the physicians that Relator was powerless to order discontinuation of split/shared billing. Rather than stand by the planned policy changes that the Trinity Compliance Department had determined were required to correct the fraudulent billing practices that plagued the Holy Cross system, Casalou announced that there would be no change to Holy Cross's split/shared billing practices or physician-compensation model. He said, in other words, that Trinity and Holy Cross would continue to permit Holy Cross physicians to falsely take credit for services they had not rendered, it would continue to pay them for doing so, and it would continue to bill Medicare and other insurance providers as if the physicians had provided the patient services.

46

111. When Casalou informed Trinity's Compliance and Legal Departments of his decision to "pause" the policy changes that would address the split/shared billing compliance issues, the heads of those departments formed an internal group—excluding Relator—and engaged an external auditing company, The Pinnacle Group, to conduct an attorney-client privileged audit. Although Relator is Holy Cross's CEO, Relator was excluded from the group and was not given access to the audit report.

112. In a February 21, 2024, email exchange, Casalou told Relator that the proposed changes to physician compensation was "creating a lot of tension." Although Casalou said, "In retrospect, we should have waited for compliance and legal to complete their investigations and issued reports before we even raised the issue with any of the doctors," Relator clarified, "Based on the preliminary results from Legal and Compliance, we had reason to believe that there were inappropriate use of APPS as well as fraudulent billing practices that needed immediate attention."

113. In this same email exchange, Relator told Casalou that he had "concerns that [Casalou's] directives to pause the proposed changes on billing/compliance issues [would] continue to further put [Holy Cross and

Trinity] at risk of pay backs and potential regulatory issues with the OIG/CMS."

To that, Casalou responded:

> This is one of these damned if we do, damned if we don't situations. While **we had reason to believe there are inappropriate use of APPs based on preliminary results**, to enact change without a final report that is reviewed and finalized by legal and compliance is difficult. Like anything else, we want to show "evidence" and "findings" and not verbal assertions. While it may appear obvious, we need to be tight in the process. My concern is that we have not had timely investigations and reports and that cannot happen in these circumstances. But we see the results when we start verbalizing our beliefs on what is happening and even assert fraudulent behavior. We set ourselves up for recourse even if we end up being correct. I don't want to see growing paybacks. I do not believe we are at risk for regulatory issues as long as we show definitive action once our audits are complete.

(Emphasis added.)

114. Addressing Relator's comment that any delay in addressing the problem would result in "an estimated $25M in excess compensation to physicians," Casalou replied:

> If compliance and billing practices are driving higher than allowed salaries, then fixing those should bring comp levels down. If it's the comp model itself, then that dictates different actions. And it may be both. **But I still believe that taking this amount comp out of your medical group, even if totally justified based on compliance and market, will be extraordinarily disruptive and even worse if you are not sitting in front of them with documented evidence.**

(Emphasis added.) Casalou said, in other words, that Trinty and Holy Cross would continue to violate federal laws and regulations by overpaying their

48

physicians above fair market value in order to placate them. Moreover, Trinity and Holy Cross continued to submit claims to Medicare and other payors under the NPIs of their employed physicians, as if the physicians were participating as required in split/share visits, when they knew they were not in fact doing so.

115. Casalou further directed Relator to pause the implementation of any change to the physician-compensation plan. Relator warned Casalou that doing so would put Trinity and Holy cross at additional risk for its failure to correct and disclose the verified compliance issues. Still, Casalou directed Relator not to "discuss, assert or mention anything related to the potential misuse of [N]PPs."

116. Relator implored Casalou to "[p]lease help us keep Compliance on track with the audits" and said, "As a reminder, we brought these concerns to Compliance in May 2023 and nothing has happened since that point in time. My concern is that the audit review will take 5+ months to conclude. In the interim, we don't know to the extent of our exposure or the amount of payback we will incur."

117. Placing the financial interests of Holy Cross's physicians above its obligation to comply with Medicare rules and regulations, Casalou encouraged Relator to go on a "road show … to open dialogue and reset relationships" with

the physicians. Relator assured Casalou that his "only concern has always been the non-compliant nature of some practices and incurring Stark and/or False Claims lawsuits." Relator said further: "I think once all of the compliance concerns are identified and corrected we can begin making the necessary adjustments and everything will fall back in line. Our only concern has been the integrity of HCH and the nature of which we serve the community." But, because the Compliance and Legal Departments did not report to him as CEO, Relator was powerless to implement any corrections or adjustments without the support and approval of Trinity executives.

118. Despite all of Relators efforts to convince Trinty executives to address the split/shared policies and practices that had led to rampant fraudulent Medicare billing, those policies and practices remained in place through the spring and summer of 2024. On March 21, 2024, Holy Cross's Director of Operations for the Medical Group, Alyson Powers, emailed Trinity's Vice President for Integrity and Compliance, Andrei Costantino, Ane McNeil, Pamela Del Negro, and Tom Hathaway reporting as follows:

> It was brought to my attention yesterday by one of our Nurse Practitioners in Cardiology that while she was reviewing her notes from the day, she saw that her supervising provider, Dr. Albuquerque, had signed off on her note stating that he saw the patient and proceeded to bill the visit under him.

> That was false documentation, as he did not see the patient with the APP.
>
> This is not the first time this has happened with Dr. Albuquerque. Previously, Carla Spina and myself had a conversation regarding this topic when we noticed it happening back in September 2023. He was told to stop immediately as documenting that you saw a patient when you did not is fraud.

Constantino responded by thanking Powers and telling her, "[W]e have action plans starting soon to address these issues."

119. By May of 2024, Relator realized that had been excluded from the working group formed to work with the Pinnacle Group to audit the false billing because Trinity executives had marked him as a whistleblower. Yet he remained determined to work to address and correct the false-billing problem he had discovered a year earlier.

120. Unsure whether Holy Cross's false billing practices had been reported to Trinity's CEO Mike Sulbowski, whether Sulbowski knew that Casalou had overridden the Compliance Department's and Relator's decision to eliminate split/shared billing and to allow the fraud to continue, or whether Sulbowski was a participant in the retaliation that Relator was suffering because of his efforts to address and correct the fraud, Relator emailed Sulbowski on May 4, 2024, detailing the fraud and the retaliation he had been experiencing.

51

Sulbowski never responded. Other Trinity executives, however, later confirmed that Sulbowski had received Relator's email.

121. Consequently, Relator concluded that Trinity would continue to relent to the physician pressure that was leading to Holy Cross's false-billing practices until it was forced to stop.

122. Indeed, in June 2024, Relator found that Holy Cross was continuing to bill Medicare and other insurance providers under physician NPIs for all of the services of NPPs providing patient services in the Holy Cross Intensive Care Unit regardless of whether the physician had rendered services that qualified for billing under his or her NPI. These practices continued across other medical units as well.

123. EPIC records that Relator has personally reviewed show, for example, that a June 10, 2024, E/M visit for patient B.G. was billed to Medicare under the NPI of orthopedic physician Ross Wodicka. The progress note for that patient encounter reveals that NPP Courtney Plesher saw the patient and determined the treatment plan. But, to hide the fact that an NPP performed that service, the note says further that Plesher acted merely as a "scribe" during the patient visit. Using a "hover" feature when reviewing the note for the visit shows that, in truth, athletic trainer Caitlin Madotta served as the scribe for the visit.

52

Although NPP Plesher performed the service and exercised all MDM, Dr. Wodicka falsely attested that he had done so and, consequently, Holy Cross falsely billed Medicare under his NPI.

124.   From his personal review of patient records maintained in EPIC, Relator has seen at least 60 examples of similar patient records falsely showing that an NPP had served as a scribe during a patient visit although the NPP actually performed the patient service and exercised the MDM. On information and belief, Holy Cross physicians falsify patient records in this fashion in order to receive wRVU credit for the work of NPPs and to thereby increase their compensation based on work they did not perform.

125.   Members of the Holy Cross and Trinity leadership team and Finance and Compliance Departments know this has occurred and continues to occur because, in August 2024, Holy Cross Healthcare Revenue Cycle and Operations Executive Carla Spina sent Relator and Holy Cross Medical Director for Health Informatics Roosevelt De Los Santos screen shots of EPIC records evidencing the falsification of the patient records via the false designation of NPPs as "scribes." Relator forwarded the email chain, together with the screenshots of the falsified records, to Santa-Cruz and Deborah Baker,

who is Santa-Cruz's direct supervisor and Trinity's Regional Compliance Manager for the states of Florida, Georgia, and Michigan.

126. The EPIC EMR system has no way to prevent physicians from changing a patient record to indicate falsely that the physician performed the service or exercised the MDM relating to a patient encounter or to falsely designate an NPP as a "scribe" rather than as the actual service provider.

127. Therefore, Relator has continued to recommend that Holy Cross either completely discontinue split/shared billing in both the inpatient and outpatient setting or to substantially increase compliance review for all split/shared patient services.

128. To Relator's knowledge, however, neither Holy Cross nor Trinity has implemented any policy change to prevent fraudulent split/shared billing under physicians' NPIs and has not reimbursed Medicare for the amounts received from billings that lacked documentation supporting physicians' attestations that they had provided the billed services.

129. Based on his personal review of more than 100 Holy Cross records maintained in EPIC and on his personal analysis of reports generated from the entirety of Holy Cross's records relating to split/share billing for the past seven years, Relator has determined that Holy Cross has falsely billed Medicare for

the services of about 50 Holy Cross physicians hundreds of thousands of times. Each false bill was based on a physician's attestation to having evaluated the patient and having formulated the treatment plan, despite any documentation supporting that claim. Every time a physician falsely attests that the physician performed a service or exercised MDM, Holy Cross has, in turn, submitted a claim to Medicare or other federal or private insurance program that falsely claims that Holy Cross is entitled to reimbursement of 100 percent of the MPFS for the particular service, although in fact Holy Cross is entitled to only 85 percent of the MPFS for each of those claims. This has occurred hundreds of thousands of times over the course of at least seven years and has resulted in the submission of, by Relator's estimation, over three hundred thousand false claims to Medicare and other federal programs.

### ii. The Anti-Kickback Statute and Stark Law Violations

130. As discussed above, the Anti-Kickback Statute prohibits the payment of remuneration to induce or reward any person for ordering or arranging for or recommending any service for which payment may be made under a federally-funded health care program. A personal-services agreement is exempt from this provision only if, among other things, the methodology for determining the compensation paid "over the term of the agreement is set in

55

advance, is consistent with fair market value in arm's-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs." 42. C.F.R.§ 1001.952(d)(1).

131. As discussed above, under the Stark Law, a "bona fide employment relationship" must satisfy the following three requirements: (1) "the amount of the remuneration under the employment [must be] consistent with the fair market value of the services," (2) the remuneration must not be "determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (3) "the remuneration [must be] provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. §§ 1395nn (e)(2).

132. Trinity and Holy Cross determine physician compensation in a manner that violates the requirements of both the Anti-Kickback Statute and the Stark Law.

133. Since at least 2017, Trinty and Holy Cross have determined physician compensation in part based on wRVUs attributed to them. This is accomplished via the use of a conversion factor, which is a dollar amount per

wRVU that is used as a multiplier to determine the value of or compensation for a procedure. Compensating physicians in this fashion gives the appearance that Trinity and Holy Cross are compensating physicians based on the fair market value of the services they render.

134.   In reality, however, Trinity and Holy Cross compensate physicians far in excess of the fair market value of their services. A comparison of the average compensation of Holy Cross physicians to the compensation of the average compensation of similarly situated South Florida physicians (as reported by the highly regarded Medical Group Management Association) shows the dramatic differences across many specialties, and in particular cardiology, neurology, orthopedics, urology, pulmonology, infectious disease, hematology-oncology, and radiation oncology:

| Specialty | HCH Avg. | South FL Avg. | Difference |
|---|---|---|---|
| Bariatric Surgery | $584,000 | $452,025 | $131,975 |
| Breast Surgery | $367,000 | $452,025 | -$85,025 |
| Cardiac Electrophysiology | $1,212,000 | $683,000 | $529,000 |
| Cardiac Invasive Cath | $1,169,330 | $674,910 | $494,420 |
| Cardiac Non-Invasive Gen. | $704,170 | $414,821 | $289,349 |
| Cardiovascular Surgery | $870,000 | $499,500 | $370,500 |

| | | | |
|---|---|---|---|
| Colorectal Surgery | $534,000 | $389,501 | $144,499 |
| Critical Care | $586,000 | $348,510 | $237,490 |
| Endocrinology | $294,000 | $245,735 | $48,265 |
| Family Medicine | $322,220 | $283,000 | $39,220 |
| Gastroenterology | $781,750 | $403,600 | $378,150 |
| Hematology/Oncology | $644,400 | $450,000 | $194,400 |
| Neurology | $448,625 | $300,000 | $148,625 |
| Obstetrics/Gynecology | $417,500 | $350,000 | $67,500 |
| Ortho/Foot and Ankle | $713,000 | $600,000 | $113,000 |
| Ortho Hand Surgery | $1,042,000 | $620,000 | $422,000 |
| Ortho Hip and Joint | $777,000 | $650,000 | $127,000 |
| Ortho Non-Surgical | $725,500 | $300,000 | $425,500 |
| Orthopaedic Surgery | $1,052,750 | $700,000 | $352,750 |
| Pain Medicine | $610,000 | $350,000 | $260,000 |
| Pathology | $535,500 | $300,000 | $235,500 |
| Pediatric General | $331,600 | $250,000 | $81,600 |
| Physical Medicine and Rehabilitation | $544,000 | $280,000 | $264,000 |
| Podiatry | $282,500 | $250,000 | $32,500 |
| Pulmonology | $625,143 | $400,000 | $225,143 |

| | | | |
|---|---|---|---|
| Radiation Oncology | $969,000 | $500,000 | $469,000 |
| Radiology | $533,000 | $450,000 | $83,000 |
| Radiation Neuro-Intervention | $1,042,000 | $600,000 | $442,000 |
| Rheumatology | $256,000 | $333,000 | -$77,000 |
| Urogynecology | $820,000 | $400,000 | $420,000 |
| Urology | $896,000 | $429,000 | $467,000 |

135. Trinity and Holy Cross pay these excessive amounts to induce physicians to provide patient services at Holy Cross, and they hide the fact that they do so in several ways.

136. First, as discussed in detail above, Trinity and Holy Cross knowingly permit physicians to take credit for the wRVUs attributable to the work of NPPs, even when the physicians have not spent more than half of the time billed with the patient or exercised medical decision-making. In this way, Trinity and Holy Cross compensate physicians for work they have not performed, which is a practice that in and of itself is inconsistent with fair market value compensation.

137. One such physician is orthopedic surgeon William Burke. In 2023, Holy Cross paid Dr. Burke $1.3 million, although the national average compensation for hospital-based orthopedic surgeons is $700,000. EPIC records

that Relator has personally reviewed show that Holy Cross compensates him so far in excess of the national average by regularly crediting him the with the wRVUs that are in fact generated by services performed by NPPs. And, to recoup as much from Medicare as possible to help cover Dr. Burke's excessive compensation, Holy Cross bills Medicare as if Dr. Burke performed the services himself.

138.  EPIC records that Relator has personally reviewed reveal further, for example, that, on February 21, 2023, NPP Emily Collins saw patient F.B. for an E/M visit. Collins devised the treatment plan and wrote the medical note memorializing the visit and treatment plan. Nothing in the medical record documents any services performed by Dr. Burke, any time Dr. Burke spent with the patient, or any aspect of medical decision-making that he performed. Yet Dr. Burke signed the patient's progress note, attesting that he had performed the services that NPP Collins had actually performed. On March 23, 2023, Holy Cross submitted to Medicare claim number 130000079652002 under Dr. Burke's NPI, seeking payment for the services provided to F.B. based on 100 percent of the MPFS for those services. In truth, Holy Cross was entitled to only 85 percent of the MPFS amount because an NPP, rather than a physician, had provided the billed services and nothing in the patient's record supported billing

under Dr. Burke's NPI. Holy Cross credited Dr. Burke with wRVUs for this service, despite that no documentation shows that he performed work for which he should be compensated.

139. Holy Cross also pays orthopedic surgeon Ross Wodicka $1.3 million per year and, as it does for Dr. Burke and other Holy Cross physicians, it regularly credits him with the wRVUs generated by the work of NPPs.

140. For example, on June 17, 2024, NPP Benjamin Johnson saw patient B.G. for an E/M visit. Johnson devised the treatment plan and wrote the medical note memorializing the visit and plan. Nothing in the medical record documents any services performed by Dr. Wodicka, any time Dr. Wodicka spent with the patient, or any aspect of medical decision-making that he performed. Yet Dr. Wodicka signed the patient's progress note, attesting that he had performed the service that NPP Johnson had actually performed. On July 8, 2024, Holy Cross submitted to Medicare claim number 1300004742479 under Dr. Wodicka's NPI, seeking payment for the services provided to B.G. based on 100 percent of the MPFS for those services. In truth, Holy Cross was entitled to only 85 percent of the MPFS amount because an NPP, rather than a physician, had provided the billed services, and nothing in the patient's record supported billing under Dr. Wodicka's NPI. Holy Cross credited Dr. Wodicka with

61

wRVUs for this service, despite that no documentation shows that he performed work for which he should be compensated.

141. Holy Cross pays cardiologist Josh Larned $1 million per year although the national average compensation for hospital-based cardiologists is $550,000 per year. As it does for Drs. Burke, Wodicka, and other Holy Cross physicians, it regularly credits Dr. Larned with the wRVUs generated by the work of NPPs.

142. For example, on September 10, 2024, NPP Lauren Ross saw patient B.G. for an E/M visit. Ross devised the treatment plan and wrote the medical note memorializing the visit and plan. Nothing in the medical record documents any services performed by Dr. Larned, any time Dr. Larned spent with the patient, or any aspect of medical decision-making that he performed. Yet Dr. Larned signed the patient's progress note, attesting that he had performed the service that NPP Ross had actually performed. On September 14, 2024, Holy Cross submitted to Medicare claim number 130000503664500 under Dr. Larned's NPI, seeking payment for the services provided to B.G. based on 100 percent of the MPFS for those services. In truth, Holy Cross was entitled to only 85 percent of the MPFS amount because an NPP, rather than a physician, had provided the billed services, and nothing in the patient's record supported billing

under Dr. Larned's NPI. Holy Cross credited Dr. Larned with wRVUs for this service, despite that no documentation shows that he performed work for which he should be compensated.

143. Trinity and Holy Cross also give physicians wRVU credit for the work of medical residents, while also paying those physicians a stipend for performing those same services. In this way, Trinity and Holy Cross compensate physicians twice for the same services.

144. In addition, Trinity and Holy Cross award many physician specialists "Medical Directorships" that are vaguely defined, loosely monitored, and lacking in specific duties. Currently, 46 physicians hold these positions. Trinity and Holy Cross compensate these physicians various amounts for holding medical directorships, with some physicians being paid an additional $50,000 per year or more without having to document that they have rendered any service supporting these payments.

145. Some physicians also have co-management agreements pursuant to which they receive additional compensation for achieving certain metrics relating to the length of a patient's stay in the hospital, the number of new patients brought in, and the quality of services provided, among other things.

These agreements are also loosely monitored and frequently result in redundant compensation for services that are already being compensated.

146. As a result of this multi-layered compensation system, Holy Cross and Trinity pay most physicians more than the amounts collected for their services, far in excess of the south Florida and national averages for those specialties, and well above fair market value.

147. In 2023 alone, Holy Cross and Trinity lost more than $50 million from this excessive compensation system.

148. Trinity and Holy Cross pay their physicians these excessive amounts of compensation as an incentive to physicians to provide patient services at Holy Cross, with those services being payable by Medicare and other federal programs to Holy Cross. Consequently, this compensation system violate both the Anti-Kickback Statute and the Stark Law.

149. Compliance with the Anti-Kickback Statute and the Stark Law is an explicit condition of payment under Medicare and other federal healthcare programs. From at least 2020 to 2024, Holy Cross has certified its compliance with the Anti-Kickback Statute and the Stark Law on each of its annual cost reports. Each of those certifications was knowingly false.

150. In reliance on Holy Cross's express and implied certifications, the United States has paid tens of millions of dollars to Trinity and Holy Cross through Medicare and other Federal Healthcare Programs. If the United States had known that Defendants' certifications were false, the United States would not have paid these amounts.

### iii.   The False Billing for Medically Unnecessary Procedures

151. On December 26, 2023 , patient D.D. was admitted to the Holy Cross emergency department for a stroke. It was confirmed that D.D. had a small ischemic stroke, the origin of which was unknown.

152. Interventional Cardiologist Dr. Daniel Wentz ordered the implantation of a Loop Recorder in D.D.'s chest cavity to monitor for any arrhythmias. A Loop Recorder is a device that records the heartbeat continuously for up to three years. Medicare treats such a device as medically necessary only if certain criteria are met.

153. In March 2024, Medicare notified D.D. that the implant was not medically necessary and refused to pay for the device.

154. When D.D. complained to the hospital, Relator examined Holy Cross's Medicare billing records to determine the number of times that Medicare had determined that services provided by Dr. Wentz and other cardiologists had

65

not been medically necessary and consequently had refused payment. Relator discovered that, in 2023, Medicare had denied as medically unnecessary cardiology claims for services of six physicians totaling more than $5,000,000.

155. Holy Cross's wRVU-based compensation structure incentivizes physicians to provide and bill for medically unnecessary services. And Relator found further that, despite the large number of denied cardiology claims, Trinity's Compliance Department had never questioned the physicians regarding these services and indeed used their billing for those services as a basis for determining their wRVU-based compensation.

156. During the course of his review, Relator also discovered that Holy Cross's radiation oncologists were violating Medicare rules and regulations related to the reimbursement of radiological oncology procedures. First, Holy Cross's radiation oncologists use CPT Code 77293, which refers to "Respiratory Motion Management Simulation," to report the services they render. This code is used in radiation therapy planning to account for motion, such as breathing, that may affect the position of the treatment area. It involves techniques like four-dimensional CT scanning, where imaging is synchronized with the patient's respiratory cycle to ensure precise targeting of the radiation therapy. Medicare billing and coverage guidelines state that CPT Code 77293 requires

66

specialized equipment for respiratory motion management, such as four-dimensional CT scanners, respiratory gating systems, or other motion tracking devices. Holy Cross does not own any such devices and has never owned the medical equipment necessary to provide the services described in CPT Code 77293. Over the last five years, Relator believes Medicare has been improperly billed over $2 million in connection with radiation oncology services that Holy Cross billed under CPT Code 77293.

157.   In addition, the radiologists at Holy Cross have improperly utilized CPT Code 77014, which is designated for billing "Computed Tomography Guidance for Placement of Radiation Therapy Fields." This code is used when a CT scanner is employed to guide the accurate positioning of radiation beams during radiation therapy sessions. It covers both the imaging and the supervision necessary to ensure precise delivery of radiation to the target area, minimizing exposure to surrounding healthy tissue. To appropriately bill under CPT Code 77014, the radiologist must be physically present during each radiation therapy session to provide the required supervision and guidance. However, hospital records that Relator reviewed indicate that the radiologists were not present for every treatment as required, rendering the billing for these services improperly

non-compliant with Medicare regulations. Over the last five years, the Relator believes Medicare has been improperly billed an additional $3 million.

158.  Further, Holy Cross is permitted to, and does, bill Medicare for the use of the specialized equipment that the radiation oncologists are purportedly using when providing the services billed under CPT Code 77293 and 77014. Holy Cross submitted claims for the use of this equipment under CPT Code 0420 or CPT Code 0430 every time its physicians submitted claims under CPT Codes 77293 and 77014, respectively. Relator estimates that this resulted in over $2 million in false claims for reimbursement.

159.  Because of the outsized number of claims that Medicare was denying, Holy Cross was on notice that its physicians in the cardiology department and its radiation oncologists were not complying with Medicare's medical-necessity-coverage requirements before rendering services. Despite its awareness of this compliance failure by its own physicians, Holy Cross continued to blindly submit the claims without any internal review to determine medical necessity and coverage. Holy Cross's submission to Medicare of claims for services that it knew or should have known were medically unnecessary constitutes the submission of false claims in violation of the FCA.

68

160. Relator also discovered that Holy Cross was improperly billing for services performed by third parties. Holy Cross contracts with a third-party service provider, AP Health, and pays them approximately $700,000 per year to provide APPs/PAs to fill gaps in patient coverage for Holy Cross's infectious disease doctors. These APPs/PAs worked directly with infectious disease physicians Dr. Marjorie Gorensack and Dr. Carlos Gueres. From February 2021 to November 2023, these physicians routinely requested that AP Health providers see patients as "scribes," although the "scribes" were actually performing the MDM and spending the majority of time for each patient encounter. The physicians would then attest to providing the service and bill the encounter as a split/shared visit.

161. According to CMS rules and regulations, split/shared billing is only permissible if all providers are part of the same group. 42 CFR § 415.140 provides that split/shared billing is allowed only when both the physician and the NPP are in the same group practice. Since the APPs/PAs provided by AP Health were employed by a third-party group, split/shared billing should not have been used for these services. Relator estimates over $10 million in false claims were submitted between February of 2021 and November of 2023 in connection with NPPs provided to Holy Cross by AP Health.

69

162.  In connection with all of the above, Holy Cross is authorized to bill Medicare for the use of its hospital facilities by physicians providing services in an outpatient setting. These claims are submitted using two specific billing codes: Medicare Revenue Code 510 and CPT Code G0463. Medicare Revenue Code 510 is used to designate "Clinic" services provided in a hospital's outpatient setting. It represents charges for a range of services that occur in a clinic environment, such as physician consultations, diagnostic tests, and treatments, when these services are delivered within a hospital-based outpatient clinic. CPT Code G0463 applies to a "Hospital outpatient clinic visit for the assessment and management of a patient." It is used to bill Medicare for facility fees associated with outpatient clinic visits, encompassing the use of the facility, equipment, supplies, and related administrative support.

163.  The charges for these outpatient services are typically included in the overall billing submitted to Medicare, which also covers the physician's professional fees. This bundled approach allows the hospital to derive significant revenue—approximately $34 million annually—from Medicare reimbursements using these facility-related codes. However, when the charges associated with Revenue Code 510 and CPT Code G0463 are linked to physician claims that contain fraudulent information or have been improperly submitted, the entire

70

billing for those services becomes tainted. The fraudulent nature of the physician claims extends to the facility fees as well, rendering the bills submitted under these codes invalid.

164. Knowingly and continuously submitting false or fraudulent claims to the government is a violation of the Stark Law and the FCA. The term "knowingly" in the context of the FCA includes situations in which a physician fails to inquire about Medicare's criteria for medical necessity or fails to perform due diligence to ensure that the procedures they recommend and bill for are covered and necessary according to Medicare's standards. Physicians have a professional responsibility to stay informed about the regulations and guidelines that govern their practice.

## V.    CAUSES OF ACTION

**Count I**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**False Claims**

165. Relator realleges and incorporates by reference the foregoing allegations of this Complaint.

166. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729 et seq., as amended.

71

167. Through the acts described above and otherwise, Defendants and their agents and employees knowingly, or with reckless disregard or willful blindness to the truth or falsity thereof, submitted or caused to be submitted false claims to Medicare for payment by the United States from at least 2020 to present.

168. Defendants violated the FCA, in that they knowingly presented and caused to be presented to Medicare false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

169. The United States, Medicare, and its fiscal intermediaries, unaware of the falsity of the claims made or submitted by Defendants and their agents and employees, paid and continue to pay Defendants for claims that would not be paid if the truth were known.

170. By reason of Defendants' false claims, the United States and the Medicare program have been damaged and are entitled to payment of actual damages in addition to a civil penalty as required by law for each false statement.

## Count II
### Conspiracy to Violate the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A) and (C)
### False Claims

171. Relator realleges and incorporates by reference the foregoing allegations of this Complaint.

72

172. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

173. Through the acts described above and otherwise, Defendants and their agents and employees conspired to knowingly, or with reckless disregard or willful blindness to the truth or falsity thereof, submit or cause to be submitted false claims to Medicare for payment by the United States from at least 2020 to present.

174. Thus, Defendants violated the FCA, in that they knowingly conspired to present and cause to be presented to Medicare false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A) and (C).

175. The United States, Medicare, and its fiscal intermediaries, unaware of the falsity of the claims that Defendants and their agents and employees had conspired to submit, paid and continue to pay Defendants for claims that would not be paid if the truth were known.

176. By reason of Defendants' conspiracy to submit false claims, the United States and the Medicare program have been damaged and are entitled to payment of actual damages in addition to a civil penalty as required by law for each false statement Defendants conspired to submit.

## Count III
## Violation of the False Claims Act
## 31 U.S.C. § 3729(a)(1)(B)
## False Records or Statements

177. Relator realleges and incorporates by reference the foregoing allegations of this Complaint.

178. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

179. Through the acts described above and otherwise, Defendants and their agents and employees knowingly, or with reckless disregard or willful blindness to the truth or falsity thereof, made, used or caused to be made or used, false records or statements to induce Medicare to pay or approve false or fraudulent claims since at least 2017 to the present.

180. Thus, Defendants violated the FCA, 31 U.S.C. § 3729(a)(1)(B), in that they knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

181. The United States, Medicare, and its fiscal intermediaries, unaware of the falsity of the records and statements made or submitted by Defendants and their agents and employees, paid and continue to pay Defendants for claims that would not be paid if the truth were known.

182. By reason of Defendants' false records, statements, and/or material omissions, the United States and the Medicare program have been damaged and are entitled to payment of actual damages in addition to a civil penalty as required by law for each statement submitted on the basis of a false record or statement.

**Count IV**
**Conspiracy to Violate the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B) and (C)**
**False Records or Statements**

183. Relator realleges and incorporates by reference the foregoing allegations of this Complaint.

184. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., as amended.

185. Through the acts described above and otherwise, Defendants and their agents and employees conspired to knowingly, or with reckless disregard or willful blindness to the truth or falsity thereof, make, use, or caused to be made or used, false records or statements to induce Medicare to pay or approve false or fraudulent claims since at least 2020 to the present.

186. Thus, Defendants violated the FCA, 31 U.S.C. § 3729(a)(1)(B) and (C), in that they knowingly conspired to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

75

187. The United States, Medicare, and its fiscal intermediaries, unaware of Defendants' conspiracy paid and continue to pay Defendants for claims that would not be paid if the truth were known.

188. By reason of Defendants' conspiracy to make and submit false records, statements, and/or material omissions, the United States and the Medicare program have been damaged and are entitled to payment of actual damages in addition to a civil penalty as required by law for each false statement Defendants conspired to submit.

## VI.   PRAYER FOR RELIEF

Relator prays for judgment against Defendants as follows:

i.      That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States sustained as a result of Defendants' actions, as well as a civil penalty against each Defendant for each violation of 31 U.S.C. § 3729;

ii.     That Relator be awarded the maximum amount allowed pursuant to section 3730(d) of the Civil False Claims Act;

iii.    That Relator be awarded all costs and expenses of this action, including attorneys' fees; and

iv.    That the United States and Relator receive all such other relief, at law or in equity, as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated:  October 25, 2024.

Respectfully submitted,

/s/ *Linda Julin McNamara*
Linda Julin McNamara
Fla. Bar. No. 7148887
email: linda@federal-lawyer.com
Oberheiden P.C.
610 East Zack Street, Suite 110-4079
Tampa, FL 33602
Telephone: (813)784-7921
Fax: (972) 559-3365

 **OBERHEIDEN PC**

**ATTORNEYS**

DR. NICK OBERHEIDEN
Washington D.C., New York

LYNETTE S. BYRD
Texas

ELIZABETH K. STEPP
New York, Texas

P. COVARRUBIAS MEYER
Texas

HON. BRIAN KUESTER
Oklahoma

JOHN W. SELLERS
Maryland

LINDA JULIN MCNAMARA
Florida

WILLIAM H. NEWMAN
New York, Georgia, Penn., VA

JENNIFER W. CORINIS
Florida, Massachusetts

ELLEN COMLEY
Texas

ALINA VENEZIANO
New York, Nevada

PAUL STRICKLAND
California

**OF COUNSEL**

HON. MIKE R. POMPEO
Washington D.C.

HON. JOHN RATCLIFFE
Texas

HON. TREY GOWDY
South Carolina

**LOCAL COUNSEL**

HON. JOE BROWN
Texas

HON. S.A. MARSHALL
Oregon

COREY STEINBERG
Florida

RICHARD T. SIMMONS
Louisiana

AARON L. WILEY
Texas

DAVID RABEN
Florida

ERICK CRUZ
Florida

KAREN PICKETT
Massachusetts

MICHAEL A. RATAJ
Michigan

BILL TUNKEY
Florida

KAMILLE DEAN
Ariz., Utah, Cal., Minn., Col.

JOSEPH NASCIMENTO
Florida

TERRY C. FRANK
Virginia, North Carolina

440 LOUISIANA STREET., STE 200
HOUSTON, TX 77002
FEDERAL-LAWYER.COM

U.S. Federal Building and Courthouse
Attn: Clerk's Office
299 East Broward Boulevard #108
Fort Lauderdale, FL 33301

October 25, 2024

Dear Sir or Madame:

I enclose a civil cover sheet and civil False Claims Act qui tam complaint to be filed under seal in accordance with 31 U.S.C. § 3730. I also enclose a check for the filing fee of $405.

Please confirm receipt and filing to linda@federal-lawyer.com. If you have any questions, you can reach me at (813)784-7921.

Many thanks for your assistance.

Linda Julin McNamara
Senior Counsel, Oberheiden P.C.
Counsel for Mark Doyle

# PRIORITY MAIL EXPRESS®

**119**

## FLAT RATE ENVELOPE
### ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP



PS10001000006

EP13F July 2022
OD: 12 1/2 x 9 1/2

---



**UNITED STATES POSTAL SERVICE ®**

**PRIORITY MAIL EXPRESS®**

**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT)   PHONE ( 813 ) 984-0121

Linda Julin McNamara
OBERHEIDEN P.C.
610 E. Zack St. Suite 110-90701
Tampa, FL 33602

**DELIVERY OPTIONS (Customer Use Only)**

☐ **SIGNATURE REQUIRED** *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
   *Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)   PHONE ( )

U.S. District Court
Attn: Clerk's Office
299 East Broward Blvd. Suite 108
Ft. Lauderdale, FL 33301

ZIP + 4® (U.S. ADDRESSES ONLY)

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 Insurance Included.

 **PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT**
Federal Agency Acct.

**ORIGIN (POSTAL SERVICE**
☐ 1-Day

PO ZIP Code

Date Accepted (MM/DD/YY)

Time Accepted   ☐ AM   ☐ PM

Special Handling/Fragile
$

Weight   ☐ Flat Rate
         lbs.        ozs.

**DELIVERY (POSTAL SERV**
Delivery Attempt (MM/DD/YY) | Ti

Delivery Attempt (MM/DD/YY) | Ti

LABEL 11-B, NOVEMBER 2023

